**Diann E. MONROE, Petitioner,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Respondent.**

**Civil Action No. 05–11512–WGY.**

United States District Court,
D. Massachusetts.

Jan. 10, 2007.

Rayford A. Farquhar, United States Attorney's Office, Boston, MA, for Respondent.

Andrew Kisseloff, Legal Services Center of Harvard Law School, Jamaica Plain, MA, for Petitioner.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

The plaintiff Diann E. Monroe ("Monroe") brought this action pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying Monroe eligibility for Social Security Disability Insurance and Social Security Income payments. Monroe challenges the decision by the Administrative Law Judge ("hearing officer"), arguing it was error to discount the opinions of her treating and examining physicians and, in turn, to adopt the opinions of non-examining physicians consulted by the Social Security Administration (the "Agency"). She asserts that the Commissioner's decision was not supported by substantial evidence and thereby requests this Court reverse the decision and direct an award of benefits.

## II. BACKGROUND

### A. Procedural History

On July 22, 2003, Diann Monroe filed applications for Disability Insurance Benefits and Supplemental Security Income payments. Transcript ("Tr.") at 14. Her initial request and her request for reconsideration were denied. *Id.* Monroe filed a timely appeal and a hearing was scheduled for December 13, 2004, in Boston, where Monroe's case was heard by hearing officer Stephen Fulton. *Id.* at 14–27. At the hearing, Monroe testified that she had been disabled since August 31, 2002, due to arthritis, high blood pressure, and depression. *Id.* at 14. After a review of the evidence and Monroe's testimony, the hearing officer issued an opinion on March 18, 2005, finding Monroe not disabled within the meaning of the Act and able to return to her past relevant work. *Id.* at 26. Monroe subsequently filed for review by the Appeals Council, which affirmed the hearing officer's decision and prompted Monroe to bring this action in this Court on July 18, 2005.

### B. Factual Background

Monroe is a fifty-four-year-old high school graduate residing in Roxbury, Massachusetts. Tr. at 31, 51. She had worked for the Polaroid Corporation in Norwood, Massachusetts, for twenty-five years until 2001. *Id.* at 31. During that period, she held the positions of a packer, assembler, repairperson, and lead worker. *Id.* at 31–37. She claims that she had arthritis while she was working, but that it became significantly worse after she was laid off, which made it more difficult for her to find a new job. *Id.* at 41. She alleges that she has been disabled since August, 2002, due to her arthritis, depression, and high blood pressure. *Id.* at 14. Monroe admits that she has a history of alcohol abuse and her primary care physician also notes she is anemic. *Id.* at 200.

#### 1. Medical Evidence

#### A. Physical Conditions

Monroe began seeing her primary care physician, Dr. Theresa Kim, in March 2003. Tr. at 199. Monroe sought treatment for arthritis, stating she could no longer open jars and was experiencing stiffness in the morning that lasted for more than an hour. *Id.* at 168. An exami-

nation revealed no cyanosis, clubbing, adema, or variscosities; her left knee had crepitus, but was otherwise unremarkable. *Id.* Dr. Kim made a note of tenosynovitis in her wrist that affected her grip. *Id.* Dr. Kim accordingly prescribed Vioxx and made a referral for her to visit the arthritis clinic. *Id.* Dr. Kim also diagnosed Monroe as having high blood pressure and prescribed medication. Tr. at 169.

On June 6, 2003, by referral from Dr. Kim, Monroe had an x-ray of her hands and wrists. Tr. at 164. The images were reviewed by Drs. Sidney Pollack and Shawn McGuire. *Id.* They found "no fracture, dislocation or other significant bony abnormality." *Id.* The doctors also stated that "[t]he overlying soft tissues are unremarkable." *Id.*

In either May or June of 2003, Monroe saw a rheumatologist for her arthritis. Tr. at 162. Drs. David Felson and Grace Lo discovered that she had bilateral small joints of the hands with bilateral wrist and ankle synovitis.[1] *Id.* Monroe had complained of morning stiffness that would last throughout the entire day. *Id.* The physicians stated that the "clinical picture was very convincing for rheumatoid arthritis." *Id.* The physicians placed Monroe on two medications, Plaquenil and Prednisone, during her first visit. *Id.*

Upon Monroe's return visit on July 31, Drs. Felton and Lo found a great improvement. "The [patient] has had a complete resolution of her joint swelling and stiffness." Tr. at 162. They did indicate that Monroe was complaining of occasional cramping in the legs, but reported that there was no longer evidence of synovitis

and that the patient was "doing quite well with respect to her arthritis." *Id.* at 162–63.

On August 15, 2003, Monroe had another appointment with Dr. Kim. Tr. at 158. Monroe told Dr. Kim that her arthritis had improved. *Id.* She said she was able to open jars and that her morning stiffness was gone. *Id.* Despite her improvements, however, she mentioned that she was still experiencing some aches in her calves, which were worse when she stood. *Id.* She also said she felt better when she stayed off her feet, but claimed the pain was worse at the end of the day when sitting. *Id.*

On a September 19, 2003, visit, Dr. Kim commented in her notes that "[Monroe] gets up from [the] chair easily today." Tr. at 156. Dr. Kim also noted Monroe's complaints of achiness and tenderness in her joints; there was, however, no swelling found. *Id.* at 154. Dr. Kim reported that the pain in Monroe's elbow, shoulder, right hip, and left knee was "day to day." *Id.*

There are no further treatment notes in the record from Dr. Kim after Monroe's September 19th appointment, but in letters dated January 20 and April 23, 2004, Dr. Kim described Monroe's medical and psychological impairments to the Social Security Disability Determination Services as disabling and preventing her from returning to work. Tr. at 193, 199. These letters were nearly identical. *See id.* Each referenced Monroe's treatment history, including an additional visit on November 21, 2003,[2] and went on to describe her symptoms. *See id.* at 193–201. Dr. Kim noted Monroe's depression as causing so-

---

1. Synovitis is defined as an "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." Stedman's Medical Dictionary 1773 (27th ed.2000).

2. Dr. Kim's letters gave no specific details as to her findings or Monroe's progress on this visit. Dr. Kim's November 21, 2003, treatment notes were not included in the record for review.

cial isolation and avoidance of her friends and family. *Id.* at 194. She stated that Monroe was experiencing anhedonia,[3] feelings of worthlessness, and decreased energy since May 2003 and stated that Monroe's physical impairments exacerbated her depression. *Id.* Dr. Kim wrote that three or four times per month, Monroe experiences "unpredictable episodes . . . of worsening pain in the small joints of her hands and feet, particularly the first MTP joint" due to her arthritis, which causes difficulties in opening jars and in holding her three-month-old granddaughter. *Id.* at 193. It was also mentioned that her anemia has contributed to her "generalized fatigue" which, in turn, has both decreased her social interactions and increased the time it takes for her to do household chores. *Id.* at 194.

Further, Dr. Kim's letters also commented that Monroe's alcohol abuse has increased her depressed mood and limited her treatment for rheumatoid arthritis. Tr. at 194. Significantly, in the April 23 letter, Dr. Kim added an additional statement that "[a]lthough, Ms. Monroe's alcohol abuse exacerbates many of the medical conditions discussed above, she would be disabled *independent* of her alcohol abuse." *Id.* at 200 (emphasis in original). This was the only difference between the January 20 and April 23 letters.

In addition to the medical evidence submitted by Monroe, the hearing officer also used consultative medical opinions from physicians employed by the Agency specializing in disability determination. *See* Tr. at 24–25. Drs. Goulding and Lipski evaluated all of the medical records submitted in Monroe's file for her initial and reconsideration disability determinations, offering their opinions as to the severity and limitations of Monroe's arthritis. *See*

*id.* Both doctors noted only moderate limitations in Monroe's functioning and mentioned her positive response to treatment as well as her ability to continue with daily activities. *Id.* at 124–25, 171–72. Drs. Goulding and Lipski opined Monroe would be able to perform work with a light exertion level with only occasional climbing. *Id.* at 125, 172. Dr. Lipski further added that Monroe should only engage in occasional stooping, kneeling, crouching, and crawling, with only occasional griping and twisting with the right hand. *Id.* at 172.

### B. Mental Impairment and Substance Abuse

Monroe has also been diagnosed with depression and alcohol abuse. In March 2003, during Monroe's first visit with Dr. Kim, the doctor did a depression screen and noted that Monroe had a depressed mood, but did not report any concentration, eating, or sleeping difficulties, nor did she report any prior history of depression. Tr. at 166. She did, however, admit to consuming alcohol regularly. *Id.*

Dr. Kim noted in the record that she and Monroe's previous physician had advised her to decrease her intake of alcohol, as she had been consuming more than three drinks per day, two or three days per week. Tr. at 166. Monroe was told drinking could interfere with her medication and increase her blood pressure. *Id.* at 169.

On August 15, 2003, Monroe attended another appointment with Dr. Kim. Tr. at 158. During this visit, Dr. Kim reports that Monroe was depressed and irritable and claimed to be stressed. *Id.* Dr. Kim noted that Monroe reported living with her daughter, who was pregnant at the time, and that there was no income to pay the

---

**3.** Anhedonia is defined as the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedman's *Medical Dictionary* 88 (27th ed.2000).

rent. *Id.* Monroe claimed she had been isolating herself and staying in her room more often but reported no sleeping difficulties or fatigue. *Id.* Dr. Kim gave a diagnosis of depression, rated as "major," and prescribed her Wellbutrin and Prozac. *Id.* at 160. She noted that she found it beneficial that Monroe had been seeing an individual therapist. *Id.* Dr. Kim also noted an improvement in Monroe's drinking, but reminded her to continue to cut back because it was limiting her treatment for arthritis. *Id.*

A week later, on August 22, 2003, Monroe met with Dr. Harry Senger, a psychiatrist at the Massachusetts Rehabilitation Commission Disability Determination Services, for a consultive examination report. Tr. at 131. Monroe reported her depressive symptoms to Dr. Senger, claiming she had been depressed for the past year. *Id.* ("[F]or about eight months it's been 'bad.' "). Monroe told Dr. Senger it had been her first long-lasting episode of depression and that she had been depressed in the past but "only for a couple of days or so at a time." *Id.* at 132. She reported being tired all the time and having lost interest in just about everything. *Id.* Monroe rated her depression on the Maximum Depression Scale as a 7 out of 10. *Id.* Dr. Senger reported that her loss of interest, fatigue, and the fact that she claimed to be losing weight are indicative of major depression, but that other symptoms were not met. *Id.* Dr. Senger also stated in his report that "she appeared neither particularly depressed, nor nervous in the session." *Id.* at 133. He gave her an ultimate diagnosis of Major Depression, Residual Type, along with Alcohol Abuse and added that her recently prescribed medication, Prozac, needed to be given time in order to evaluate whether or not she will benefit from it. *Id.* at 133–34. Otherwise, Dr. Senger pointed out that she is fairly self-sufficient; she does her own

self care, laundry, house keeping, cooking, and shopping. *Id.* at 134. He also claimed that during their session, "she [was] able to comprehend, remember and carry out instructions and to relate here well." *Id.* Dr. Senger also noted that she frequently socializes with her family and her boyfriend; she reported, however, that she does not see any friends by her own choice. *Id.* at 132.

On September 19, 2003, Dr. Kim reported that Monroe's mood had improved and a mental status exam revealed "no depression, anxiety, or agitation." Tr. at 156. She also noted Monroe was less irritable and overwhelmed. *Id.* at 154. Dr. Kim commented that she felt Monroe was continuing to benefit from individual therapy and inferred that Monroe's "[decrease] in alcohol has probably helped with [her] mood." *Id.* at 154, 157.

The last evaluation in the record submitted by Monroe is from Dr. Stuart Clayman, a psychologist, who met with Monroe just prior to the hearing on October 21, 2004. Tr. at 202–07. During the session, Monroe told Dr. Clayman her "problems with depression began about three years ago" which she related to her history of physical abuse and her various medical problems. *Id.* at 202. "[Monroe] said [that] when she is depressed she experiences sad mood, anhedonia, worthlessness, decreased energy, social isolation and frequent angry moods." *Id.* She claimed she was having difficulties concentrating and reported some weight loss of two to three pounds over a month period; Monroe, however, believed her weight loss was due to her dental problems. *Id.* at 205. Monroe denied any suicidal or homicidal ideation, but said she felt hopeless two to three days per week and had difficulties concentrating. *Id.* She admitted to drinking one-quarter pint of gin and three beers per day, but told Dr. Clayman that her con-

sumption had been reduced. *Id.* at 202. Dr. Clayman noted that Monroe says she is able to care for herself and conduct household activities such as cooking, cleaning, and shopping. *Id.* at 203. She also reported having a close relationship with her daughters and getting along well with her boyfriend. *Id.* Based on Dr. Clayman's observations in a mental status exam, he stated, "[t]oday she appeared to be moderately depressed." *Id.* at 205.

Dr. Clayman ran a battery of psychological tests. Tr. at 205–06. On the Beck Anxiety Inventory, her responses indicated she was reporting severe anxiety, which Dr. Clayman found to be inconsistent with his observations of her. *Id.* at 206. On the Beck Depression Inventory, however, he found her score reporting severe depression to be "relatively consistent" with his observation of her. *Id.* On the Trail–Making Test, he reported that Monroe had significant difficulties, which suggested limitations in executive functioning, motor slowing, visual scanning difficulties, and conceptual confusion. *Id.*

Dr. Clayman's conclusion was that Monroe was depressed, but that she did not meet the diagnosis of Major Depressive Disorder at that time. Tr. at 206. He said she fit the diagnosis for Depressive Disorder, NOS, moderately severe, which he claimed "is manifested by a depressive syndrome including anhedonia, diminished interests, fatigue, low energy level and difficulty concentrating." *Id.* Dr. Clayman opined that "[t]he depression is resulting in severe limitations in social interacting and ability to cope with stressful circumstances." *Id.*

Dr. Clayman also felt he had found some signs of dementia "manifested by impaired ability to recall previously learned material and disturbance in executive functioning." Tr. at 206. He added "[t]he dementia, which appears to be relatively mild today, is probably related to alcohol abuse." *Id.*

He further remarked that the dementia is "not necessarily permanent, [however,] the reversibility usually depends on appropriate treatment.... [which] [i]n her case, this would include becoming sober." *Id.* at 207. He ultimately concluded, however, that Monroe's depression and dementia would disable her even if she were to become sober indefinitely. *Id.* at 206.

Dr. Clayman reported that Monroe told him she had terminated her individual therapy eight months earlier because "she got 'scared,'" but Dr. Clayman felt that even had she continued with therapy, it would not have made a significant improvement in her symptoms. Tr. at 206–07.

The hearing officer also consulted the Agency physicians' assessments of the medical and psychiatric records of Monroe. Tr. at 23–26. Drs. Fischer and McKenna opined that Monroe was not disabled within the meaning of the Act. *See id.* Dr. McKenna reviewed the record and found insufficient evidence to establish a mental impairment on the alleged onset date of August 2002. *Id.* at 24. Dr. McKenna asserted that from July 2003 to July 2004, absent Monroe's alcohol abuse, there were no signs of severe mental impairment. *Id.* at 24, 181. Dr. Fischer found Monroe's daily living activities and her social functioning only mildly affected by her depression and found Monroe's concentration to be only moderately affected with no episodes of decompensation. *Id.* at 23–24, 145. Dr. Fischer's assessment posited that Monroe could understand and remember simple and complex instructions and could carry out simple and complex tasks for two hour intervals in an eight hour work day. *Id.* at 23–24, 151.

## III. DISCUSSION

### A. Standard of Review

Judicial review of a Social Security Disability determination decision is

outlined in 42 U.S.C. § 405(g), which states, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is that which "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). The Court must be mindful that "issues of credibility and the drawing of permissible inferences from evidentiary facts are the prime responsibility of the [Commissioner]." *Id.* (citing *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965)). "Accordingly, this Court must affirm the Commissioner's denial 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'" *Guyton v. Apfel*, 20 F.Supp.2d 156, 161 (D.Mass.1998) (quoting *Rodriguez Pagan v. Sec'y of Health and Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987)).

**B. Disability Standard and the Hearing Officer's Decision**

■ A person seeking to collect Social Security disability benefits must prove that she is disabled as defined by the Act. *See Deblois v. Sec'y of Health and Human Servs.*, 686 F.2d 76, 79 (1st Cir.1982). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Further, one can only be considered disabled under the Act where one's mental or physical impairments are so severe that it is not only impossible to return to one's previous relevant work but, given the claimant's age, education, and work experience, she would be unable to engage in any substantial gainful work that exists in the national economy. *See id.* § 423(d)(2)(A).

There is a five-step analysis required for determining eligibility. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The Commissioner will only move from one step in the sequence to the next if an adverse determination cannot be made at the previous step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step is to consider whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, then the claimant is not disabled. *Id.* Second, the severity of the claimant's medical and psychological impairments are assessed. *Id.* § 404.1520(a)(4)(ii). If there is a severe impairment, then step three is to determine whether the impairment meets the listed criteria under the regulations[4] and its duration requirement. *Id.* § 404.1520(a)(4)(iii). Fourth, if the claimant has a recognized condition that is severe, the Agency will consider her residual functioning capacity[5] to determine if the claimant can still do her past relevant work. *Id.* § 404.1520(a)(4)(iv). If no determination is made at step four—meaning the claimant has been found unable to do any of her past work—the fifth and final step requires the Agency to determine whether there are any jobs in the national economy that the claimant could do with her established impairments. *Id.* § 404.1520(a)(4)(v).

---

**4.** 20 C.F.R. Pt. 404, Subpt. P, App. 1. Section 12.04, Affective Disorders, is specifically applicable to this case.

**5.** Residual functioning capacity is defined in 20 C.F.R. §§ 404.1545 as the most an individual can do after considering the effects of physical and or mental limitations that affect the ability to perform work related tasks.

In the instant case, the hearing officer followed the procedure through the first three steps of the process, determining she was severely impaired, but ultimately found her residual functioning capacity stable enough for her to return to her previous work as an assembler. Tr. at 21. The hearing officer based his decision on the medical records supplied by Monroe, including assessments and opinions from the treating and examining physicians. The hearing officer also used opinions of consulting physicians hired by the Agency and Monroe's own testimony at the hearing. To formulate his conclusion that Monroe would be able to return to her previous relevant work, the hearing officer relied on the testimony of an occupational expert who answered the hypothetical question whether a person of Monroe's age, education, and work experience, with the same mental and physical capabilities, would be able to perform any of Monroe's past positions of employment. *Id.* at 48–49. The occupational expert concluded such a person would be able to do the light assembly work. *Id.* at 49.

## C. Plaintiff's Challenge

### 1. Evaluating the Validity of the Opinions of Treating and Examining Physicians

 Monroe argues that the hearing officer erred in endorsing the consulting physicians' opinions over the conclusions of Dr. Clayman and Dr. Kim. Under 20 C.F.R. § 404.1527(d)(1)-(2), the hearing officer should "generally" give more weight to a source who has treated the claimant as a patient or examined the person. Treating physicians' opinions are preferable because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* § 404.1527(d)(2).

 This principle, however, is not dispositive. Even though the hearing officer must take medical evidence, "the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts." *Lizotte v. Sec'y of Health and Human Servs.,* 654 F.2d 127, 128 (1st Cir.1981); *see* 20 C.F.R. § 416.927(e)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disabled.... A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Although opinions from treating and examining physicians may be considered helpful, and in many cases controlling, the hearing officer is only required to make a decision that is supported by substantial evidence. *See Rodriguez,* 647 F.2d at 222–23. Therefore, if the hearing officer comes to a conclusion contrary to that of the treating physician and alternatively adopts the opinion of a non-examining source, then this Court must uphold his decision as long as a "reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion." *See Lizotte,* 654 F.2d at 128. This remains true even if this Court, sitting as trier of fact, would conceivably rule otherwise. *See id.* at 131.

Thus, the questions for this Court with respect to the hearing officer's choice to give less weight to the opinions of Drs. Kim and Clayman center on two issues. First, whether the hearing officer had a reasonable explanation for rejecting the opinions of the treating physicians and,

second, whether the hearing officer had substantial evidence to support the his contrary finding.

### a. Monroe's Treating Physician

Monroe contends in her brief to this Court that "Dr. Kim's medical evaluations should have been recognized as controlling," and that the hearing officer erred in reading Dr. Kim's letter to the Agency stating that Monroe would be disabled "*independent* of her alcohol abuse" as changing her diagnosis instead of simply clarifying her message. Monroe Memorandum [Doc. No. 7] ("Mem.") at 10. Monroe argues that the hearing officer relied on this incorrect interpretation to lessen incorrectly the weight of Dr. Kim's diagnosis. *Id.*

■ This assertion is misguided. Dr. Kim's medical evaluations, specifically her treatment records, were a primary source of evidence that influenced the hearing officer's final determination. *See, e.g.,* Tr. at 18. Though Dr. Kim's opinion that Monroe was disabled (as stated in her letters) was dismissed as not credible, the hearing officer's reasoning is articulated in the decision:

> The claimant and her representative were afforded an opportunity to submit updated medical evidence to support Dr. Kim's statement, however no new medical evidence was provided. The last treatment record of Dr. Kim is September 2003 were [sic] the claimant's physical findings were within normal limits

with normal gait, no evidence of any mental limitations and the claimant reported better mood and functioning. Because the State Agency's medical consultant's review found minimal limitations in the claimant's ability to perform work-related functions, the undersigned concludes that Dr. Kim's opinion cannot be adopted.

*Id.* at 19.

The hearing officer correctly pointed out that at the last office visit on record with Dr. Kim, Monroe was suffering from achiness and tenderness but endured no swelling and was able to get up from the chair easily. Tr. at 19, 154. Monroe's mood had improved and Dr. Kim had reported no depression, anxiety, or agitation. *Id.* at 154. Dr. Kim commented that with a decrease in alcohol consumption it may be possible to treat her arthritis with a new agent. *Id.* at 157, 160.

■ The divergence between the opinion in Dr. Kim's letters and her last medical treatment notes in the record calls into question the validity of her disability assessment, especially without explanation or further objective evidence.[6] Dr. Kim's letter suggesting Monroe is disabled is an opinion of a treating physician that the hearing officer must consider, but only against the weight of the evidence as a whole. *See* 20 C.F.R. § 416.927(e)(1)-(2). The hearing officer's choice to accept a non-treating, non-examining physician's

---

6. *See Shaw v. Sec'y of Health & Human Servs.,* No. 93–2173, 1994 WL 251000, at *5 (1st Cir. June 9, 1994) (table decision). In *Shaw,* the appellant's argument that the hearing officer erred by failing to obtain additional information was rejected by the court, stating that "[t]here was a consultative examination here, and the [hearing officer] apparently did not see the need for more evidence ... Appellant, too, had an obligation. She was required to produce all information supportive of her claim. She was well represented by a parale-

gal under the supervision of an attorney [and was] afforded ample opportunity to present her case and did not indicate any desire to offer further evidence." *Id.* (internal citation omitted).

It should be noted that Monroe had legal representation in this matter and that almost eight months elapsed between Dr. Kim's April 23 letter and the disability hearing on December 13, 2004, in which to proffer additional evidence. *See* Tr. at 14.

assessment is completely permissible within the regulations "provided there is support for the result in the record." *Shaw*, 1994, WL 251000, at *4; *see also Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir.1991).

 Here, Dr. Kim's own treatment records establish that Monroe's mental and physical ailments had been improving. *See* Tr. at 154–61. This, combined with other physicians' reports of Monroe's own statements to doctors and her own testimony at the hearing constitute sufficient evidence for the hearing officer to find the consulting physicians' opinions consistent with the record as a whole.

The hearing officer correctly noted that Monroe herself reported that she can manage cleaning, shopping, using public transportation, and cooking. Tr. at 18, 115–120, 132, 203. Moreover, the x-ray reports of Drs. McGuire and Pollack confirmed there were no abnormalities with Monroe's hands. *Id.* at 164. The treatment notes of Drs. Lo and Felson at the rheumatology clinic indicated significant improvements with the use of medication and steroid treatment with no signs of synovitis. *Id.* at 162. Dr. Kim's last treatment record reported only soreness and indicated that Monroe was able to get up from the chair easily and exhibited no swelling. *Id.* at 154. Additionally, as the hearing officer mentioned, Monroe's continued alcohol use has been cited by almost all her physicians as negatively affecting her ability to receive alternative treatment for her arthritis as well as contributing to her depression. *Id.* at 25, 157, 160, 163, 169, 200, 206, 207.

Thus, the opinions of the consulting physicians, Drs. Goulding and Lipski, are consistent with the evidence that Monroe's positive response to treatment and only minimal limitations to her daily life do not constitute a disability as defined by the Act. The hearing officer, therefore, did not err in adopting their medical assessments, and his ultimate conclusion in this regard is supported by substantial evidence.

### b. Dr. Clayman's Psychological Evaluation

 Monroe also argues that the hearing officer committed error in not granting controlling weight to the psychological evaluation of Dr. Clayman. Mem. at 11. Both Dr. Kim and Dr. Clayman claim Monroe can no longer engage in substantial gainful activity because of her severe depression and mental limitations. Tr. at 25. Although the hearing officer agreed with Monroe that she had such a severe mental impairment as to fit the criteria of an affective disorder in part A of section 12.04 (Part 404 Subpart P, Appendix 1.), he disagreed in part B that her impairment was limiting her ability to perform and function in a work related environment. *Id.* at 21–22. The specific criteria required a finding of two of the following: 1) a marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpt. P, App. 1, section 12.04.

Dr. Clayman's psychological report states that Monroe's depressive disorder and impaired mental functioning causes a severe limitation to her social interactions, impairs her concentration, and inhibits her ability to cope with stressful situations. Tr. at 206–07. He also discovered limitations in executive functioning and some signs of dementia. *Id.* Monroe argues that these findings by Dr. Clayman indicate her residual functioning capacity under section 12.04 prevents her from engaging in employment because her mental deficiencies markedly affect her activities of daily liv-

ing (section 12.04 B(1)), foster a marked reduction in her social interactions (section 12.04 B(2)), and demonstrate her inability to concentrate (section 12.04 B(3)). *See* Mem. at 7–8.

The hearing officer stated that he decided not to adopt the opinion of Dr. Clayman because his conclusions were "not supported by any objective data" and "indicate an over-reliance on the claimant's subjective complaints as his findings of disability are inconsistent with the objective findings in his own report." Tr. at 19–20. The hearing officer noted:

> the claimant underwent the examination that formed the basis of Dr. Clayman's opinion not in an attempt to seek treatment for symptoms, but rather through attorney referral and in connection with an effort to generate evidence for the current appeal. Further, the doctor was presumably paid for the report. Although such evidence is certainly legitimate and deserves due consideration,

the context in which it was produced cannot be entirely ignored.

*Id.* at 20.[7]

The hearing officer's statement implies a belief that Dr. Clayman overstated the severity of Monroe's conditions in his conclusion when compared to Monroe's own statements reported in her initial interview and Dr. Clayman's impressions from the mental status exam.[8] Even completely unskewed by Monroe's subjective responses, Dr. Clayman's assessment can still be viewed as inconsistent with other substantial evidence in the record.

In rejecting Dr. Clayman's evaluation, the hearing officer adopted Dr. Fischer's opinion that Monroe's psychological impairments only posed minor to moderate limitations to her residual functioning capacity. Tr. at 23. The hearing officer agreed that Monroe's depression had only mild effects on her activities of daily living as evidenced by her ability to initiate her own self-care and undertake household chores such as cooking, cleaning, and shop-

---

**7.** The Court notes from Dr. Clayman's report that the examination took place at the office of Monroe's legal representative less than two months before the hearing. Tr. at 202.

**8.** For instance, Dr. Clayman found Monroe's remote and short term memories intact with some impairment in her delayed memory. Tr. at 204. Yet he concludes that the dementia he found, through Monroe's scores on the Trail–Making Test coupled with her depression, reaches the severity to make her disabled. *Id.* at 206–07. Dr. Clayman also goes on to say that "[t]he dementia, which appears relatively mild today, is probably related to alcohol abuse. . . . Although dementia is not necessarily permanent, the reversibility depends on appropriate treatment. In her case, this would include becoming sober." *Id.* He felt, however, the combination of her depression and dementia would disable her even if she were to become sober and remain sober indefinitely. *Id.*

The hearing officer observed that Dr. Clayman's conclusion that Monroe had marked difficulties in concentration appears to be

overstated considering his observations that her "[r]esponsiveness to my questions is adequate," *Id.* at 20, 204, and "[s]he does not appear anxious today," her "[a]ffect is normal. Persistence and pace are average, while focus is below average." *Id.* at 205.

Dr. Clayman also commented that "[s]he is independent in personal care. She cleans her apartment and makes her bed[,] . . . does her own laundry and food shopping[,] . . . manages her own funds[,] . . . read[s] books and occasionally play[s] solitaire. She uses public transportation independently. She watches television five hours per day." *Id.* at 203. In addition, Monroe reported to Dr. Clayman that "she gets along well with her boyfriend," has a "normal relationship with her siblings" and a "close relationship with both her daughters." *Id.* These observations undermine Dr. Clayman's statement that there are "severe limitations in social interacting" as a result of her depression. *See id.* at 206.

ping. *Id.* at 17, 132, 203. Monroe also uses public transportation independently and manages her own finances. *Id.* When asked at the hearing whether her depression affects her ability to get out and find a job, she answered that it does not and that she has been applying for jobs. *Id.* at 45.

The hearing officer also adopted Dr. Fischer's opinion that Monroe has only mild deficiencies in her social interactions. Tr. at 23. Even though it is noted that Monroe has isolated herself in her room more often, does not engage in any community groups, and chooses not to keep in touch with friends, the reports of Dr. Senger as well as Dr. Clayman evidence that she frequently socializes—as seen from statements such as "she has a boyfriend she sees daily," she "takes a bus to visit her mother three times a week," *id.* at 132, and has "a close relationship with her daughters," *id.* at 205. She claimed to Dr. Senger that the reason she does not stay in touch with friends is that she "does not want to talk about her problems and does not want to hear about theirs." *Id.* at 132. Although the record does indicate diminished interests and some social withdrawal, the hearing officer's endorsement of Dr. Fischer's assessment that Monroe only possessed minor limitations in social functioning is supported by substantial evidence. *See id.* at 25. There is no error in the hearing officer's decision that the findings of Dr. Clayman—suggesting Ms. Monroe's depression results in "a severe limit in social interacting"—conflicts with the record. *Id.* at 24–25.

The hearing officer also found reason to defer to Dr. Fischer's evaluation of Monroe's concentration, persistence, and pace. The record as a whole, including Dr. Kim's consistent mental status exams, revealed only mild concentration or memory impairments, if any. Furthermore, Dr. Senger's evaluation notes Monroe's ability to "comprehend, remember and carry out instructions and to relate." Tr. at 134. The fact that Monroe is able to engage in her daily activities without issue and stated at the hearing that she "can concentrate all right" supports Dr. Fischer's assessment that her moderate limitations are not "marked" as required by section 12.04. *See id.* at 46.

### 2. Alleged Errors in Residual Functioning Capacity

▮ Monroe alternatively argues that even if her depressive disorder, alone, would not markedly affect her ability to function in the work environment, the hearing officer erred in failing to consider Monroe's physical ailments in combination with her mental impairments in evaluating her residual functioning capacity. Mem. at 13. Monroe asserts that her medical problems coupled with her depressive symptoms make her incapable of doing her past relevant work as an assembler. *Id.* at 13–14.

A review of the record suggests that the hearing officer considered all of Monroe's mental and physical limitations when making his determination. The hearing officer specifically addressed in the decision the factors that went into his residual functioning capacity analysis:

> The claimant's alleged impairments, symptoms, medication daily activities, and appearance and testimony at the hearing have been carefully considered. The Administrative Law Judge, after consideration of the Social Security Regulations 404.1529 and 416.929, including the nature, frequency, location, duration, and intensity of the claimant's purported pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, that

the claimant has undergone for relief; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms, concludes that the claimant's allegations of subjective complaints are exaggerated and are not credible to limit the claimant in [her] ability to perform substantial gainful activity.

Tr. at 20.

The hearing officer's analysis was based on all the medical and psychological evidence available to him. He then formulated a conclusion, based on the professional recommendations of the consulting physicians, that she could lift and carry up to 20 pounds occasionally and 10 pounds frequently. Tr. at 20. She could stand and sit for a total of six hours in an eight hour workday. *Id.* He said she would be able to perform tasks that occasionally required crouching, climbing, kneeling, stooping, crawling, and grasping and twisting with the right hand. *Id.* He claimed she would be able to understand and remember complex and simple instructions and could interact appropriately with co-workers and supervisors. *Id.* After making this determination, he posed a hypothetical scenario to the vocational expert inquiring whether a woman of Monroe's age, education, work experience, and the capabilities mentioned above would be able to do Monroe's past relevant work. *Id.* at 48–49. The vocational expert answered that such a person could perform light assembly work. *Id.* at 49.

Since the hearing officer's conclusions regarding to Monroe's capabilities are supported by substantial evidence, it was appropriate for the hearing officer to adopt the opinion of the vocational expert to formulate his conclusion, as the vocational expert's assessment was based on that very same analysis of the evidence. Therefore, Monroe's residual functioning capacity was appropriately considered sufficient to resume employment under the Social Security Act.

## III. CONCLUSION

Accordingly, the Court holds the Commissioner's decision was supported by substantial evidence and is hereby AFFIRMED. Accordingly, the Agency's Motion for an Order Affirming the Decision of the Commissioner [Doc. No. 9] is ALLOWED.

SO ORDERED.