**Mark VALIQUETTE, Plaintiff**

**v.**

**Michael J. ASTRUE [1], Commissioner of the Social Security Administration, Defendant.**

**Civil Action No. 06–10025–GAO.**

United States District Court,
D. Massachusetts.

Aug. 3, 2007.

---

**1.** Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, replacing Jo Anne Barnhart, who was the original named defendant in this action. He has been substituted as the defendant pursuant to Fed. R.Civ.P. 25(d)(1).

Michael J. Kelley, Law Office of Michael J. Kelley, Boston, MA, for Plaintiff.

Gina Y. Walcott–Torres, United States Attorney's Office, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The Commissioner of the Social Security Administration denied the application of the plaintiff, Mark Valiquette, for Disability Insurance Benefits and Supplemental Security Income payments. By this action, Valiquette seeks to reverse that denial or, in the alternative, to remand the matter for reconsideration. The parties have cross-moved for judgment. After consideration of the record and the parties' submissions, I conclude that the plaintiff's motion for an order reversing the decision of the Commissioner should be GRANTED, and defendant's motion for an order affirming the decision should be DENIED.

### I. Procedural History

The plaintiff originally applied for benefits on October 22, 1999. His application was denied by the Social Security Administration ("SSA") on December 29, 1999. (R. at 72–75.) The plaintiff requested reconsideration on January 4, 2000 (R. at 76–77), which request was denied on May 8, 2000 (R. at 78–81). He then claimed a hearing before an administrative law judge ("ALJ") and a hearing was held in Boston, Massachusetts on November 28, 2000 before the Honorable Robert L. Halfyard. (R. at 33–69.) A supplemental hearing

was held on April 11, 2001. (R. at 267–326.) The ALJ issued an unfavorable decision on July 19, 2001. (R. at 16–24.) A request for review of the hearing decision was filed with SSA's Appeal Council, and on May 24, 2002, the Appeals Council upheld the ALJ's decision. (R. at 462–63.) Valiquette then sought review of the decision in this court. *Valiquette v. Barnhart,* No. 02–11485–RCL (D.Mass.). On May 21, 2003, Judge Lindsay ordered the matter remanded to the Commissioner for further hearing. (R. at 327.) Specifically, Judge Lindsay ordered:

> [U]pon remand, the Commissioner will assign this case to the administrative law judge ("ALJ"), who will hold a hearing and issue a new decision. The ALJ will reassess Plaintiff's credibility, giving specific reasons grounded in the evidence for his findings. The ALJ will reassess Plaintiff's residual functional capacity in light of the new credibility finding and will proceed through the sequential evaluation process, obtaining vocational expert testimony if warranted.

*Valiquette,* No. 02–11485–RCL, slip op. at 1 (D.Mass. May 21, 2003).

A second hearing was held on March 3, 2005 before the same ALJ (R. at 361–417), and another decision unfavorable to the plaintiff was issued on October 25, 2005 (R. at 336–347). The ALJ found that the plaintiff's impairments did not preclude him from performing sedentary work or work requiring only light exertion. (R. at 346–47.) Accordingly, the plaintiff was found not to be disabled as defined in the Social Security Act at any time through the date of the decision. *See* 20 C.F.R. 404.1505(a); 20 C.F.R. § 416.905(a). The SSA affirmed the ALJ's decision on November 9, 2005. (R. at 333–35.) The present action is brought pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner.

## II. *Factual Background*

The record discloses the following facts:

The plaintiff was born on April 18, 1960. (R. at 99.) He is a high school graduate and has some community college education. (R. at 109.) He has worked as an auto mechanic, construction laborer, trade show utility person, foreman, construction supervisor and truck driver. (R. at 279–86, 367–70.) The plaintiff stopped working in 1998. (R. at 368.)

On February 19, 1999, the plaintiff was treated at the Brockton Hospital Emergency Department for back pain. (R. at 161–62.) The plaintiff had explained that, while bending over, he felt a pop in his back. (R. at 162.) He said that he had a long history of chronic lower back pain. (*Id.*) He was prescribed some pain medications (R. at 163), and he returned twice in the next week for more medication (R. at 155–58, 159–60).

On May 3, 1999, the plaintiff had a neurosurgical consultation with Dr. Ronald K. Warren. (R. at 192.) Dr. Warren reviewed an MRI of the plaintiff's back taken on March 11, 1999 at Brockton Hospital, and he noted that the MRI demonstrated fairly normal alignment. (*Id.*) He noted also a pseudo disc herniation at the L4–5 level as a result of slight hypoplastic formation of the L5 vertebra. (*Id.*) There was no root nerve compression. (*Id.*) Dr. Warren examined the plaintiff and noted that his gait was normal, but that he flexed forward to only 20 degrees and complained of bilateral lower back pain. (R. at 193.) The plaintiff's back revealed tenderness over the sacroiliac joints bilaterally and subgluteally bilaterally. (*Id.*) Toe and heel walks were accomplished without signs of weakness. (*Id.*) Reflexes were normal but sensation

was generally decreased over the left leg. (*Id.*) Dr. Warren's impression was "chronic back pain with bilateral sacroiliitis secondary to congenital spondylolisthesis L5–S1." (*Id.*) He recommended that the symptoms be managed and to this end suggested injections of Depo–Medrol in the sacroiliac joints and the left facet complex. (*Id.*)

A May 19, 1999, radiology report ordered by Dr. Warren indicated that the plaintiff had unilateral spondylosis of the L5 and no evidence of spondylolisthesis. (R. at 150.) Dr. Warren saw the plaintiff again on June 3, 1999. He noted that the ex-rays showed no evidence of instability on flexion or extension and that alignment was maintained, and therefore suggested that the plaintiff go ahead with the contemplated injection. (*Id.*) Valiquette was scheduled for an injection in September, 1999, but was unable to have it because he lacked insurance coverage to pay for it. (R. at 196.)

Valiquette continued to see Dr. Warren from time to time through 2000. On February 17, 2000, Dr. Warren noted that the plaintiff continued to experience the same symptoms of pain, and he prescribed Percocet, Motrin, and Flexeril. (R. at 195.) The plaintiff had the previously contemplated sacroiliac injection on March 7, 2000.(*Id.*) On April 3, 2000, Dr. Warren noted that after the plaintiff's injection, he reported increased pain across the top of the sacrum and into his left leg, and on May 18, 2000, Dr. Warren recommended percutaneous nucleotomy. (*Id.*)

On June 14, 2000, the plaintiff underwent percutaneous automated nucleotomy at L5–S1, performed by Dr. Warren at Caritas Norwood Hospital. (R. at 199.) On July 7, 2000, Dr. Warren noted that the plaintiff reported improvement in his left leg pain and left-sided back and S 1 pain, but noted that the plaintiff now had pain in the right para-lumbar area. (R. at 194.)

On September 5, 2000, Dr. Warren noted that the plaintiff reported paresthesias in his feet and increased pain in the right parasacral area. (R. at 194.) He also noted the left leg was better but that the plaintiff walked slowly and complained of pain, although he stood easily to illustrate his pain. (*Id.*) On examination, plaintiff showed tenderness at the sacroiliac joint, his straight leg raising was negative, and he had no motor or sensory deficit. (*Id.*)

On October 17, 2000, Dr. Warren stated that the plaintiff returned with the same complaints. (R. at 194.) Dr. Warren filled out a physical capacities evaluation in which he opined that the plaintiff could only lift up to five pounds occasionally and was unable to squat, crawl, climb or reach. (R. at 191.) The limitations recorded were all based on the plaintiff's complaints of pain on exertion. (R. at 191, 194.) On December 7, 2000, Dr. Warren wrote to ALJ Halfyard that the plaintiff was disabled due to "chronic back pain with bilateral sacroiliitis that is secondary to congenital spondylolisthesis." (R. at 237.) He stated that the plaintiff would be limited as described in a physical capabilities evaluation dated October 17, 2000 for a period of twelve months or longer, and that he was disabled as set forth in the evaluation. (*Id.*)

In addition to his treatment by Dr. Warren, the plaintiff was evaluated by other physicians at various times. On February 15, 2000, Dr. John F. Coldeway conducted a consultative orthopedic examination of the plaintiff, apparently at the request of the Traveler's/Aetna Insurance Company. (R. at 230–36.) Dr. Coldeway concluded that the plaintiff was fit to perform only modified light duties, which would allow frequent change of body position from standing to sitting as needed and which

would not require any heavy lifting over 20 pounds frequently or 50 pound occasionally. (R. at 235–36.)

On January 26, 2001, the plaintiff was referred to Dr. Jeffrey Jampel by the Massachusetts Rehabilitation Commission Disability Determination Services for a consultative psychological examination. (R. at 240–45.) Dr. Jampel noted that there was "no evidence of formal thought disorder," but that "there may be times when [plaintiff] is mildly depressed but his symptoms [were] subclinical." (R. at 245.) He concluded his assessment by stating that the plaintiff had "no clear cut psychological difficulties and his cognitive capacities are in the Average range, available to him, and there are no indications of intellectual limitations . . . . although he could, perhaps, be thought of as struggling with an adjustment disorder with depressed mood because of his inactivity." (Id.)

On February 2, 2001, the plaintiff was referred to Dr. Michael Braverman by the Massachusetts Rehabilitation Commission Disability Determination Services for another consultative psychological examination. (R. at 238–39.) Dr. Braverman noted that the plaintiff had a significant adjustment disorder with depression and frustration associated with the chronic pain and impairment in his functioning. (Id.)

On April 16, 2002, the plaintiff again saw Dr. Warren, who noted that the plaintiff still continued to have back and hip pain. (R. at 709.) On physical examination, the plaintiff walked comfortably without apparent weakness or difficulty. (Id.) There were no motor or sensory deficits and reflexes were symmetrical. (Id.) Straight leg raising was negative. (Id.) Dr. Warren assessed that the plaintiff had "unremitting lower back pain," possibly secondary to congenital spondylolisthesis L4–5 and facet arthropathy L5–S1 and encouraged

him to proceed with an evaluation at the Spalding Rehabilitation Hospital. (Id.)

Dr. Sagun Tuli examined the plaintiff at the Brigham and Women's Hospital on November 13, 2002. (R. at 759–61.) His diagnosis was disc herniation at L5–S1 without cord compression. (Id.) The plaintiff's lumbar flexion was only 20°, but otherwise normal, and he had some decreased sensation at L5. (Id.) His motor strength, reflexes and gait were all normal. (Id.) Although he reserved making a prognosis pending an MRI, Dr. Tuli advised that the plaintiff should not lift more than 20 pounds until a further workup had been done. (Id.)

The MRI ordered by Dr. Tuli was done December 20, 2002. The report of the imaging indicated, in pertinent part:

> Axial images provided through the cervical and the lumbar spine further demonstrate that there is mild facet osteoarthritis at L4–5 and L5–S1 with moderate right neural foraminal narrowing at the L5–S1 level. There is left mild neural foraminal narrowing at this level.

(R. at 748, 762.) Dr. Tuli's impression was that there was "[s]pondylosis without significant central canal stenosis . . . . [a]nd moderate right neural foraminal narrowing at C6–7, C7–T1 and at L5–S1, mostly due to facet osteoarthritis." (R. at 748.) A December 20, 2002 electromyography and nerve conduction study concluded "This is a normal study. There is no electrophysiological evidence of a focal neuropathy or radiculopathy affecting the right arm or left leg." (R. at 755–56.)

On February 25, 2003, the plaintiff visited Dr. Sanjeet Narang at the Brigham and Women's Hospital Pain Management Spine Center. (R. at 799.) Dr. Narang noted that the plaintiff still complained of low back pain, that he was taking OxyContin at the time, that his pain was worse on

extension of the lumbar spine, and that he also had a positive bone scan as well as facet osteoarthropathy on the MRI. (*Id.*) Dr. Narang further noted that he explained the benefits and alternatives of facet joint injection to the plaintiff and that the plaintiff was willing to try this procedure. (*Id.*)

On March 18, 2003, Dr. Narang noted that the plaintiff had "moderate distress as pain 4/10 over the lower back." (R. at 798.) Dr. Narang performed facet joint injections for pain control. (*Id.*) On April 15, 2003, Dr. Narang noted that the facet joint injection provided relief for only about one week and stated that he was disinclined to do further injections on someone who was prone to movement and disturbance. (R. at 797.) Dr. Narang opined that the plaintiff would benefit most from medication management. (*Id.*) Nonetheless, apparently at the plaintiff's request (R. at 796), he received epidural steroid injections which were performed on September 8, 2003 and November 10, 2003. (R. at 793, 794.)

On December 24, 2003, the plaintiff underwent an MRI examination at Brockton Regional MRI Center. (R. at 802, 803.) The results showed no significant central canal nor foraminal stenosis; no significant granulation tissue; L1–2 disc protrusion; L4–L5 disc bulge with tiny annular tear; and previously observed L4–5 disc extrusion/sequestration to be no longer present. (*Id.*)

On January 5, 2004, Dr. Narang noted that the December MRI had shown that the earlier disk protrusion had regressed and that prior injections had not been very beneficial. (R. at 792.) He also noted that the plaintiff seemed stable on his doses of OxyContin (10 mg, two or three times a day as prescribed by Dr. Jay Portnow). (*Id.*) Dr. Narang stated that he might consider an IV lidocaine infusion as a "last ditch effort" but that he believed he did not have anything new to offer. (*Id.*) He had essentially the same opinion when he examined the plaintiff about two months later, describing the plaintiff as being "in mild distress." (*Id.*)

In the summer of 2004, Valiquette was examined by two medical consultants for the Massachusetts Rehabilitation Commission. On June 17, 2004, the plaintiff was seen by Dr. Michael J. Bohnert, who noted that the plaintiff had possible mild adjustment disorder with depression, secondary to the pain and limitations as a result of his back condition. (R. at 782–86.) On August 16, 2004, the plaintiff underwent a consultative orthopedic examination by Dr. C. Nason Burden. (R. at 787–90.) Dr. Burden noted that the plaintiff had a condition of his lumbar spine which was disabling and apt to be chronic. (*Id.*) He also opined that the plaintiff was incapable of going back to the heavy work but that the plaintiff had "some ability of motion of his back with limitations . . . ." (R. at 789.)

On December 16, 2004, Dr. Jay Portnow completed a Physical Capacity Evaluation and indicated his opinion that the plaintiff only had the ability to sit, stand or walk for less than an hour in an eight-hour work day, and could lift or carry only up to five pounds, but that he was capable of simple grasping and fine manipulation with both hands and could both bend and reach occasionally. (R. at 825.)

### III. *Discussion*

Pursuant to regulations promulgated by the Social Security Administration, a person is disabled if he has an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20

C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). To meet this definition, a person must have a severe impairment that makes him unable to do his past relevant work or any other substantial gainful work that exists in the economy. (*Id.*)

In determining whether a person has a disability, the Commissioner utilizes a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.905(a); *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir.2001). Through the first four steps of the inquiry, the claimant has the burden of demonstrating that he has a disability that prevents him from engaging in the type of work he had performed previously. 20 C.F.R. § 404.1520(a)(4)(i)-(iv); 20 C.F.R. § 416.920(a)(4)(i)(iv). If the claimant can establish such a disability, the inquiry proceeds to a fifth step, where the government bears the burden of demonstrating that the claimant has the capacity to perform some other type of work available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 416.920(a)(4)(v); *Seavey*, 276 F.3d at 5; *Ortiz v. Sec'y of Health and Human Servs.*, 890 F.2d 520, 524 (1st Cir.1989) (per curiam). If the plaintiff cannot make an adjustment to such other work, he is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 416.920(a)(4)(v). For purposes of judicial review, the factual findings of the Commissioner are conclusive so long as they are supported by substantial evidence. *See* 42 U.S.C. 405(g); *Seavey*, 276 F.3d at 9; *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222–23 (1st Cir.1981).

The plaintiff argues that the ALJ failed properly to re-evaluate the plaintiff's credibility, especially as to his subjective complaints of pain, as directed by the District Court's order of remand. He further argues that the ALJ failed to recontact his treating physician, Dr. Warren, to clarify the basis for Dr. Warren's opinion that the plaintiff was disabled, as he asserts the ALJ was required to do pursuant to 20 C.F.R. § 404.1512(e). Finally, he contends that the ALJ's ultimate conclusion that he had the ability to perform "the full range of sedentary work and light exertion jobs identified by the vocational expert" and therefore was not under a "disability," (R. at 347), was not supported by substantial evidence and should be overturned. 42 U.S.C. § 405(g); *Seavey*, 276 F.3d at 9.

### A. *Credibility Determination*

 The claimant's credibility, particularly concerning his subjective complaints of pain, may be assessed and considered in evaluating his residual functional capacity ("RFC").[2] *See Frustaglia v. Sec'y of Health and Human Servs.*, 829 F.2d 192, 195 (1st Cir.1987); *Picard v. McMahon*, 472 F.Supp.2d 95, 101–03 (D.Mass.2007). Generally, credibility determinations "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the [plaintiff]." *Da Rosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986); *see also Frustaglia*, 829 F.2d at 195; *Musto v. Halter*, 135 F.Supp.2d 220, 227 (D.Mass. 2001). In reviewing the record for substantial evidence, a court must keep in mind that "[i]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility

---

**2.** A claimant's residual functional capacity is an administrative assessment of what work-related activities an individual can perform despite his limitations. 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a); *see also* SSR 96–8p, 61 Fed.Reg. 34474, 34475 (1996).

of the Secretary." *Rodriguez,* 647 F.2d at 222 (quoting *Rodriguez v. Celebrezze,* 349 F.2d 494, 496 (1st Cir.1965)) (internal quotations omitted); *Monroe v. Barnhart,* 471 F.Supp.2d 203, 210 (D.Mass.2007). Furthermore, the court must uphold the Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support the Commissioner's conclusion. *Rodriguez,* 647 F.2d at 222–23; *Monroe,* 471 F.Supp.2d at 210.

The obligation to assess the claimant's credibility is important in any case, but especially so in this one, given this Court's instructions in the remand order that the ALJ reassess the plaintiff's credibility, "giving specific reasons grounded in the evidence for his findings." *Valiquette,* No. 02–11485–RCL, slip op. at 1. Although the order does not explicitly say so, it may be inferred that the ALJ's previous credibility assessment had been considered insufficient, making reassessment necessary. In his first decision, the ALJ had said this about the plaintiff's credibility:

> The claimant is partially credible as when he requested a hearing and stated "I am unable to work. I worked construction. I will never be able to do that anymore" (Exhibit 4B). The claimant's impairments may certainly preclude medium or heavy construction labor. However, at issue is the ability to perform even sedentary or light substantial gainful activity. Although he has a sacrolitis [sic] problem, he has recuperated from the percutaneous automated nucleotomy on June 14, 2001, and his pain appears

exaggerated. He has demonstrated little effort to find a job requiring less exertion than his past work. His testimony regarding alcohol abuse, the loss of his driver's license due to a DUI charge versus failure to pay an excise tax, and reported work history following a workers compensation injury contained inconsistencies and contradictions and thus he lacks complete credibility. (R. at 22.) The ALJ further noted that Dr. Warren's assessment of the plaintiff's RFC was made on the "basis of complaints of pain on exertion." (*Id.*)

It appears that there were three concerns that the ALJ had that led him to doubt the plaintiff's credibility. First, the plaintiff's description of his pain seemed "exaggerated" when compared with objective medical data. Second, he did not appear to have made much of an effort to find work involving lower levels of exertion. And third, his testimony in some respects had "contained inconsistencies and contradictions." (*Id.*)

After a second hearing following the remand, the ALJ made the following findings concerning the plaintiff's credibility:

> The United States Court requests findings as to credibility. Social Security does not undertake investigations as to activities, or test assertions or motivations in an adversary hearing. He basically lives alone on welfare, and has done so for many years (Exhibit 27F).[3] He is at times self centered and sarcastic about his entitlements to disability (Exhibits 28F page 4).[4] Several years

---

[3]. Exhibit 27F is a letter from the plaintiff to the SSA's Office of Hearings and Appeals dated August 31, 2001. In the letter, the plaintiff stated that he had been found disabled by the Massachusetts Department of Transitional Assistance and found eligible for public housing by the Brockton Housing Authority. (R. at 781.)

[4]. Exhibit 28F is a consultative examination report by Michael J. Bohnert, M.D. dated June 17, 2004. Reporting on his mental status examination of the plaintiff, Dr. Bohnert wrote: "He says about his mood, 'Regular, same as any other day.' His affect was broad in range and was well modulated. He did express a certain frustration over not being

ago he rejected job [sic] involving race cars because it was obviously too strenuous (Exhibits 16F page 2).[5] But he has never looked for entry level, unskilled sedentary type work.

He is evasive about alcohol problems, but admits losing his drivers license when convicted for driving under the influence in 1986 (Exhibits 16F page 2).[6] He is evasive about why he still does not have a driver's license. His latest expensive MRI shows minimal back irregularities, he never had much work history; he has not looked for work in years. He's not a credible witness as to his own disability.

(R. at 345 (footnotes added).)

■ These findings regarding credibility are no less perfunctory than the ALJ's first set of findings that led to the remand. In substance, the ALJ relied on the same three reasons for finding the plaintiff not credible as he had before: the apparent inconsistency between the plaintiff's subjective pain complaints and the objective medical record, the plaintiff's inadequate efforts to search for employment he could tolerate, and "evasiveness" about his use of

alcohol and the circumstances of his loss of his driver's license in the late 1980s.

The only new observation by the ALJ was that the plaintiff was "at times self centered and sarcastic about his entitlements to disability," referring, apparently, to the "certain sarcastic quality to his commentary" reported by Dr. Bohnert, rather than any sarcasm displayed in the hearing before the ALJ. Granting the fact of the sarcasm, it is not clear—it is certainly not explained by the ALJ—why sarcastic commentary is evidence of a lack of credibility.

Though the ALJ did make reference to particular parts of the record in his findings on credibility, those references do not particularly support the ALJ's credibility assessment. For instance, it does not appear that the plaintiff misrepresented his limited efforts to find suitable employment. The fact that he may have been less diligent in that respect than he ought to have been is not obviously a reason for doubting his credibility, especially where he did not apparently misrepresent the extent of his efforts. If the ALJ thought that the plaintiff was malingering in order to bolster exaggerated claims of pain, this Court's remand order required him to make such a

---

awarded Social Security Benefits while there is a war being conducted in Iraq at the cost of billions and billions of dollars, he notes, to the American people. There is a certain sarcastic quality to some of his commentary at times. He has a normal stream of mental activity. His thought is coherent and goal directed. There is no evidence of hallucinations, delusions, or ideas of reference." (R. at 785–86.)

5. Exhibit 16F is a consultative examination report by Jeffrey Jampel, Ph.D. dated January 26, 2001. With respect to the reference in the ALJ's findings, Dr. Jampel wrote: "Valiquette notes, in regard to employment, that he has been offered a job 'on the rig,' helping out with race cars, as he knows people in that sport, but has not been able to take advantage of this, again, because of his back difficulties." (R. at 241.)

6. Dr. Jampel noted: "He, however, lost his license in 1988 or 1989 for a driving under suspension charge. It would seem that his suspension may have been a function of his having had trouble with driving while drinking, noting a DUI charge in 1986. In this regard he notes that there are no current difficulties with alcohol abuse. This will be detailed further below." (R. at 241.) Later in the same report Dr. Jampel wrote: "In regard to alcohol use, as above, he has apparently struggled with this in the past. He notes no other substance abuse. He may have a couple of beers 'now and then.' He will get 'a buzz' once a month although he always eats when he has some beers. He notes no significant alcohol or drug problems." (R. at 243.)

finding specifically, supported by evidence that would justify it. As the record stands, however, the plaintiff's relatively weak efforts at seeking employment he could perform is plausibly consistent with his reports of his pain and its consequent limitations. In other words, his limited efforts to seek employment might be seen, contrary to the view taken by the ALJ, as evidence of pain at the higher levels claimed by the plaintiff. The ALJ had an obligation to say why he rejected this possible inference in favor of the exaggeration inference he drew, explaining his decision by specific reference to the evidence in the record.

Similarly, the record does not establish exactly why the plaintiff's driver's license was suspended in the late 1980s—whether the suspension was a direct result of the plaintiff's DUI arrest, as the ALJ supposed; or the result of operating after suspension, as Dr. Jampel speculated; or the consequence of his failure to pay his excise tax, as the plaintiff testified. (R. at 374.) It appears that the ALJ thought the plaintiff's testimony was "evasive" because the plaintiff gave a reason other than the DUI arrest for the loss of his license. Again, however, the plaintiff did not conceal the fact of the arrest. He, after all, was the original source of the information to the examining doctors. A denial might have called his credibility into question, but it is not clear why, having acknowledged the arrest, he would then dissemble about the reason for the suspension, as if non-payment of taxes as a reason for a license suspension was so clearly less embarrassing than driving under the influence.

In brief, in both instances just discussed, the evidence cited by the ALJ simply did not support the inferences he drew. More to the point, if he thought the inferences were justified by the evidence, he was obliged—not only by general rules, *see* SSR 96–7p, 61 Fed.Reg. 34483, but also by his particular obligation under the remand order—to explain why.

On consideration of the record as a whole, it was possible to think that there was some dissonance between the objective medical assessments and the plaintiff's description of the level of pain he was experiencing. But the existence of any such inconsistency merely poses the question of the credibility of his subjective complaints, it does not answer it. "[A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence.... [T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is *only one factor* that the adjudicator must consider in assessing an individual's credibility." *Makuch v. Halter,* 170 F.Supp.2d 117, 127 (D.Mass.2001) (quoting SSR 96–7p, 61 Fed.Reg. at 34,487)(emphasis in original). Rather, "[b]ecause symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements...." SSR 96–7p, 61 Fed.Reg. at 34484.

■ The ALJ did not adequately assess the credibility of the plaintiff's subjective complaints of pain either under the applicable cases and administrative rules or under this Court's remand order. His findings that the plaintiff lacked credibility were without a substantial basis in the record evidence, and they cannot be permitted to stand. Furthermore, the ALJ's

conclusion that the plaintiff could perform sedentary work or work involving light exertion depended in substantial degree on his rejection of the plaintiff's description of the pain-related limitations on his ability to work. Accordingly, the conclusion that the plaintiff had a residual functional capacity to perform some work available in the national economy must also be set aside as unsupported.

## B. *Recontacting treating physician for additional information*

The plaintiff also argues that the ALJ should have recontacted Dr. Warren for clarification of his opinion that the plaintiff was disabled after finding Dr. Warren's basis for making a physical limitation evaluation was inadequate because it relied heavily on the plaintiff's subjective pain complaints, which he had discounted.

Generally, the Commissioner is expected to give greater weight to opinions from treating physicians than to opinions from consulting or reviewing physicians. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2). If the Commissioner finds that a treating physician's opinion as to the nature and severity of the claimant's impairment is well-supported and is not inconsistent with the other substantial evidence in the claimant's case record, it will generally be given controlling weight. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2). When the evidence from a claimant's treating physician is inadequate to determine whether a claimant is disabled, the adjudicator is expected to recontact the claimant's treating physician to determine whether supplementing or clarifying information can be provided. 20 C.F.R. § 404.1512(e)(1).

■ Although the ⸰plaintiff now complains that the ALJ failed to recontact Dr. Warren, it does not appear that he pressed the point to the ALJ at the hearing. As a matter of fact, when the question of recontacting the treating source arose, the plaintiff's attorney advised the ALJ: "He [the plaintiff] doesn't have that source any more so we, we got an updated RFC from the new source." (R. 371.) The new source was Dr. Jay Portnow, whose Physical Capacities Evaluation dated December 16, 2004, was placed in the record on the plaintiff's behalf as Exhibit 36F. There is, therefore, no viable claim of any default on the part of the ALJ in this respect.

## IV. *Conclusion*

■ For the foregoing reasons, the Commissioner's decision that the plaintiff was not disabled is VACATED. The matter is remanded to the Commissioner for reconsideration in light of this Court's conclusion that the ALJ's finding that Valiquette lacked credibility must be set aside. Because it has been determined twice on review that the ALJ made an inadequately supported finding that Valiquette's subjective complaints of pain were not credible, once after a specific remand for the purpose of making adequate findings, that issue should not be recommitted for further consideration. In assessing Valiquette's residual functional capacity and his ability or inability to perform work other than his past relevant work, the ALJ should assume the credibility of Valiquette's subjective complaints of pain.

It is SO ORDERED.